# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO
# Judge Nina Y. Wang

Civil Action No. 22-cv-01060-NYW-MEH

TED S. RICHAN,

    Plaintiff,

v.

AGEISS, INC.,

    Defendant.

## ORDER ON MOTION TO COMPEL ARBITRATION

This matter comes before the Court on Defendant's Motion to Compel Arbitration filed on May 20, 2022. [Doc. 45]. The Court concludes that oral argument will not materially assist in the resolution of this matter. Having considered the Motion and associated briefing, the applicable case law, and the entire docket, the Motion to Compel Arbitration is respectfully **DENIED**.[1]

### BACKGROUND

Plaintiff Ted S. Richan ("Plaintiff" or "Mr. Richan") was formerly employed by Defendant AGEISS, Inc. ("Defendant" or "AGEISS"), first as a senior consultant and then as the company's president. [Doc. 36 at ¶¶ 4, 7]. Plaintiff was terminated from his employment with Defendant on March 31, 2021. [*Id.* at ¶ 7]. Plaintiff initiated this civil action on May 24, 2021, alleging that during his employment with Defendant, Defendant engaged in a pattern of retaliation, discrimination, unfair treatment, and harassment towards him before eventually wrongfully

---

[1] Originally, this Court fully presided over this matter pursuant to 28 U.S.C. § 636(c) and the Order of Reference dated May 31, 2022. [Doc. 49]. On July 22, 2022, Judge Wang was confirmed as a United States District Judge and now presides over this case in this capacity. *See* [Doc. 58].

terminating him in retaliation for having initiated investigations of harassment and discrimination within the company. *See, e.g.*, [*id.* at ¶¶ 8, 12]. Plaintiff asserts two claims for relief: (1) a claim seeking severance pay under the Puerto Rico's Act No. 80, 29 L.P.R.A § 185a; and (2) retaliation under Puerto Rico's Act No. 115, 29 L.P.R.A. § 194, *et seq. See* [*id.* at 6-7].[2]

On May 20, 2022, AGEISS filed the instant Motion, arguing that Mr. Richan entered into an employment agreement with AGEISS that "governs all matters relating to Richan's terms and conditions of employment" and that "contains a voluntary agreement to arbitrate all disputes related to the [employment agreement] or Richan's employment." [Doc. 45 at 1]. AGEISS requests that the Court enforce the arbitration clause, compel arbitration in this case, and dismiss Plaintiff's Complaint. [*Id.* at 1-2]. Mr. Richan opposes the Motion to Compel Arbitration, arguing that Defendant has not met its burden of demonstrating the existence of a valid arbitration agreement between the Parties. *See generally* [Doc. 53]. The Court addresses the Parties' arguments below.

## LEGAL STANDARD

The Federal Arbitration Act ("FAA") provides that contractual agreements to arbitrate disputes "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Section 3 of the FAA obligates courts to stay litigation on matters that the parties have agreed to arbitrate, while section 4 authorizes a

---

[2] This case was originally filed in the General Court of Justice for the Commonwealth of Puerto Rico. *See* [Doc. 1 at 1]. On June 7, 2021, Defendant removed this case to the United States District Court for the District of Puerto Rico. [Doc. 1]. Then, Defendant filed a Motion to Transfer Venue under 28 U.S.C. § 1404(a), requesting that the case be transferred to the District of Colorado. [Doc. 12 at 8]. The Motion to Transfer Venue was granted by the District of Puerto Rico on March 31, 2022, and in doing so, the District of Puerto Rico determined that Defendant's request to compel arbitration should be decided by this District, as the selected forum. [Doc. 33]. The case was transferred to this District on May 2, 2022. [Doc. 34].

federal district court to compel arbitration for a dispute over which it would have jurisdiction. *See* 9 U.S.C. §§ 3, 4. "By its terms, the [FAA] leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985).

But because "arbitration is a matter of contract," the Court cannot require a party "to submit to arbitration any dispute which he has not agreed so to submit." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002) (citation omitted). Indeed, "[t]he existence of an agreement to arbitrate is a threshold matter which must be established before the FAA can be invoked." *Avedon Eng'g, Inc. v. Seatex*, 126 F.3d 1279, 1287 (10th Cir. 1997). The party seeking to compel arbitration bears the burden of establishing that the matter at issue is subject to arbitration. *See Hancock v. Am. Tel. & Tel. Co., Inc.*, 701 F.3d 1248, 1261 (10th Cir. 2012); *GATX Mgmt. Servs., LLC v. Weakland*, 171 F. Supp. 2d 1159, 1162 (D. Colo. 2001). "Unlike the general presumption that a particular issue is arbitrable when the existence of an arbitration agreement is not in dispute, when the dispute is whether there is a valid and enforceable arbitration agreement in the first place, the presumption of arbitrability falls away." *Riley Mfg. Co. v. Anchor Glass Container Corp.*, 157 F.3d 775, 779 (10th Cir. 1998). "Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." *Riley Mfg. Co.*, 157 F.3d at 779.

## ANALYSIS

### I.     The Employment Agreement

During the course of Mr. Richan's promotion to president, an Executive Employment Agreement (the "Employment Agreement") was drafted and exchanged between the Parties. *See*

3

[Doc. 45 at 2; Doc. 53 at 3].  The Employment Agreement contains the following arbitration provision:

> This Agreement shall be governed by, and construed in accordance with, the laws of the State of Colorado without its conflict of law principles.  All disputes regarding this Agreement shall [be] resolved by arbitration to be administered by the American Association of Arbitration.

[Doc. 11-2 at 5, § 5.4].

The Parties agree that Mr. Richan did not sign the Employment Agreement, *see* [Doc. 53 at 7; Doc. 54 at 4-5], but dispute whether Mr. Richan nevertheless assented to the Employment Agreement.  Defendant contends that Plaintiff did assent, relying on emails exchanged between Mr. Richan and AGEISS employees.  [Doc. 45 at 2, 10].  Specifically, on December 31, 2020, Donna Lawrence, a founder of AGEISS, *see* [Doc. 11-1 at 1, ¶ 3], sent an email to Patty Moonan, AGEISS's Human Resources Manager, *see* [*id.* at 1], copying Mr. Richan and Jeff Lawrence, another founder of AGEISS.  [*Id.* at 1, ¶ 3]; *see also* [id. at 10-11].  In her email, Ms. Lawrence requested that Mr. Lawrence and Mr. Richan "confirm via email response that [they] approve adding [their] electronic signature[s] to the attached documents." [*Id.* at 10].  After Mr. Lawrence replied stating "[p]lease affix my e signature to these documents," Mr. Richan responded: "Everything looks good.  Patty – please sign for me as well." [*Id.*].  AGEISS maintains that through this email, Mr. Richan granted Ms. Moonan permission to sign the Employment Agreement on his behalf.  [Doc. 45 at 2; Doc. 54 at 4].  While AGEISS acknowledges that Mr. Richan's signature was never placed on the Employment Agreement (by Ms. Moonan or otherwise), it attributes this to an oversight:

> Moonan affixed Richan's signature to the Loan Agreement and its exhibits, one of which was supposed to be the [Employment Agreement].  But, while the Loan Agreement contained a blank 'placeholder' page for the [Employment Agreement], the actual [Employment Agreement] was erroneously omitted from the packet and Richan's signature was thus not affixed to it.

4

[Doc. 54 at 4-5]; *see also* [Doc. 54-4 at ¶ 4].

Mr. Richan disagrees that he assented to the Employment Agreement, arguing that there is "no evidence" that he agreed to arbitrate his claims. [Doc. 53 at 8]. Plaintiff states that the December 31, 2020 email was "in reference to [a] loan agreement," *not* the Employment Agreement. [*Id.*]. Moreover, Plaintiff asserts that the Parties' negotiations over the Employment Agreement were never finalized and argues that because the Parties were "still in negotiation of essential terms" of the Employment Agreement, "no contract exists." [*Id.* at 9]. Mr. Richan has submitted a declaration in which he states, under penalty of perjury, that he "never agreed to the [Employment Agreement] through execution or otherwise" and "never consented to or agreed to the arbitration provision reflected in the [Employment Agreement]." [Doc. 53-1 at ¶¶ 4-5]. Because the Parties dispute the existence of a valid arbitration agreement, the Court must determine whether a valid arbitration agreement exists before the FAA can be invoked. *Avedone Eng'g*, 126 F.3d at 1287.

## II.  Arbitrability

Before the Court turns to the merits of the Parties' dispute, the Court first addresses a preliminary issue: whether the Parties' dispute should be resolved by the Court or by an arbitrator. *See Riley Mfg. Co.*, 157 F.3d at 779 ("Before we address the specific arbitrability of the claims raised . . . in [this] federal suit, we must address the threshold issue of who decides arbitrability in the first place—the courts or an arbitrator."). In its Motion, Defendant argues that "[s]hould [Mr.] Richan dispute any aspect of the enforceability of the arbitration clause in the [Employment Agreement], that dispute must be resolved by an arbitrator" because the Employment Agreement "explicitly states that all disputes regarding the Agreement shall be resolved by arbitration." [Doc. 45 at 11-12]. In response, Plaintiff counters that the question of arbitrability is for the Court to

decide, asserting that "it is reversible error to refer this issue to the arbitrator absent clear and unmistakable intent to delegate the issue to the arbitrator." [Doc. 53 at 5]. Defendant does not respond to this argument or develop its argument more on Reply. *See* [Doc. 54].

The Court agrees with Plaintiff. "With respect to determining the arbitrability of a dispute, the law generally favors a judicial resolution rather than arbitral resolution." *O'Connor v. BMW of N. Am., LLC*, No. 18-cv-03190-CMA-STV, 2020 WL 5260416, at *2 (D. Colo. July 23, 2020) (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944-45 (1995)); *see also BG Grp., PLC v. Republic of Argentina*, 572 U.S. 25, 34 (2014) ("[C]ourts presume that the parties intend courts, not arbitrators, to decide what we have called disputes about 'arbitrability.'"). "So long as the parties have not specifically agreed to submit the arbitrability question itself to arbitration (i.e., to arbitrate arbitrability), a court will decide independently whether the merits of the parties' dispute is arbitrable." *Burlington N. & Santa Fe Ry. Co. v. Pub. Serv. Co. of Okla.*, 636 F.3d 562, 568 (10th Cir. 2010). In contrast, where the parties "clearly and unmistakably" show an intent to reserve issues of arbitrability to the arbitrator, "the court must refer such issues to the arbitrator." *O'Connor*, 2020 WL 5260416, at *2 (citing *Belnap v. Iasis Healthcare*, 844 F.3d 1272, 1292-93 (10th Cir. 2017)); *see also Gourley v. Yellow Transp., LLC*, 178 F. Supp. 2d 1196, 1202 (D. Colo. 2001) (a court can "determine initially the existence of a valid arbitration agreement unless there is 'clear and unmistakable evidence' within the four corners of the agreement that the parties intended to submit to an arbitrator the question of whether an agreement to arbitrate exists.").

Without passing on the issue of whether a valid arbitration agreement exists, the Court concludes that even assuming that the Employment Agreement governs the Parties' dispute, it does not contain clear and unmistakable evidence that the Parties agreed to arbitrate arbitrability. First, "there is nothing in the language" of the Employment Agreement expressly "delegating authority

6

to the arbitrator to decide issues of arbitrability," and thus, the express language "falls short of providing clear and unmistakable evidence that the parties intended the arbitrator to decide issues of arbitrability in contravention of the normal practice of having the courts do so." *Dish Network, L.L.C. v. Ray*, 226 F. Supp. 3d 1168, 1172 (D. Colo. 2016), *aff'd*, 900 F.3d 1240 (10th Cir. 2018); *see also Stanek Holdco, Inc. v. Water Res. Grp., Inc.*, No. 19-cv-03194-WJM-SKC, 2020 WL 4753895, at *4 (D. Colo. Aug. 17, 2020) ("The arbitration provisions at issue in the Employment Agreements are silent regarding the question of who determines arbitrability.  As such, the determination about whether WRG's claims are arbitrable is left to the Court.").

Defendant argues that the Parties clearly and unmistakably delegated arbitrability to the arbitrator because the Employment Agreement states that all disputes regarding the Agreement are to be resolved by the American Association of Arbitration ("AAA"). [Doc. 45 at 12; Doc. 11-2 at 5, § 5.4].  The Tenth Circuit has held that the incorporation of specific arbitration rules into an arbitration agreement constitutes clear and unmistakable evidence of an intent to arbitrate arbitrability. *See Belnap*, 844 F.3d at 1281 (Judicial Arbitration and Mediation Services ("JAMS") Rules); *Dish Network*, 900 F.3d at 1246 (AAA Rules).  This is because these procedural rules specifically reserve arbitrability issues to the arbitrator; for instance, Rule 6(a) of the AAA Rules states that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." AAA, Employment Arbitration Rules and Mediation Procedures, Rule 6(a) (effective Nov. 1, 2009). JAMS Rules operate similarly.  *See* JAMS Streamlined Arbitration Rules & Procedures, Rule 8(c) (June 1, 2021) ("Jurisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are proper Parties to the Arbitration, shall be submitted and ruled on by the Arbitrator.").

7

However, the Employment Agreement does not expressly incorporate the AAA Rules; rather, it simply states that arbitration shall be *administered by* the AAA. *See* [Doc. 11-2 at 5, § 5.4 ("All disputes regarding this Agreement shall [be] resolved by arbitration to be administered by the [AAA].)"]. The Court finds this omission material, where the authorities finding clear and unmistakable evidence of an agreement to arbitrate arbitrability rely specifically on the incorporation of the Rules themselves. *See, e.g.*, *Dish Network*, 900 F.3d at 1245 (agreement stating that "[a] single arbitrator engaged in the practice of law from the [AAA] shall conduct the arbitration under the then current procedures of the AAA's [Rules]"); *Belnap*, 844 F.3d at 1275 (agreement requiring arbitration "in accordance with the rules of JAMS"); *Border Area Mental Health, Inc. v. United Behav. Health, Inc.*, 303 F. Supp. 3d 1154, 1159 (D.N.M. 2018) (disputes "shall be submitted to binding arbitration in accordance with the rules of the [AAA]."); *Waltrip v. Pilot Travel Ctrs.*, No. CV 21-642 GBW/KRS, 2022 WL 2192892, at *11 (D.N.M. June 17, 2022) (the parties "consent to the resolution of all disputes covered by this Agreement in accordance with AAA Rules.").

This case is analogous to *Grigsby v. Income Property USA, LLC*, wherein the agreement in question stated that "any and all disputes which may arise between [the parties] shall be decided in binding arbitration conducted by" the AAA. No. 2:17-CV-1110, 2018 WL 4621766, at *4 (D. Utah Sept. 26, 2018). Because the agreement "did not refer to or incorporate any rules that give the arbitrator the authority to decide the question of arbitrability," the court concluded that the arbitrability issue was appropriate for judicial determination. *Id.* Similarly, in *Fedor v. United Healthcare, Inc.*, the parties' arbitration agreement stated that "[t]he rules and procedures to be used by the parties are *generally based on* the [AAA Rules]." No. CV 17-13 MV/KBM, 2021 WL 1840449, at *7 (D.N.M. May 7, 2021), *aff'd*, No. 21-2051, 2022 WL 1073444 (10th Cir. Apr. 11,

8

2022) (emphasis in original). The *Fedor* court concluded that the agreement's language was insufficient to constitute clear and unmistakable evidence of an intent to arbitrate arbitrability. *Id.* Here, the Employment Agreement simply mentions that arbitrations will be administered by AAA, but does not expressly state that all disputes over the Agreement will be governed by the AAA Rules. [Doc. 11-1 at 5, § 5.4]. Courts may not assume that parties agreed to arbitrate arbitrability absent clear and unmistakable evidence to the contrary. *Belnap*, 844 F.3d at 1280-81. Absent any argument from Defendant explaining why the Employment Agreement's mere reference to the AAA constitutes clear and unmistakable evidence of an intent to arbitrate arbitrability, the Court cannot conclude that such evidence exists, and thus does not delegate the issue of arbitrability to an arbitrator. *Grigsby*, 2018 WL 4621766, at *4.

**III.   Whether a Valid Arbitration Agreement Exists**

"[A]lthough the presence of an arbitration clause generally creates a presumption in favor of arbitration, this presumption disappears when the parties dispute the existence of a valid arbitration agreement." *Bellman v. i3Carbon, LLC*, 563 F. App'x 608, 613 (10th Cir. 2014). In this circumstance, courts apply a standard "similar to summary judgment practice." *Id.* at 612-13 (citations omitted). The moving party first must submit "evidence sufficient to demonstrate the existence of an enforceable agreement." *Id.* at 612. If the movant meets this burden, the burden shifts to the nonmoving party "to raise a genuine dispute of material fact regarding the existence of an agreement." *Id.* Only when it is "clear no material disputes of fact exist and only legal questions remain may a court resolve the arbitration question by ruling on a motion to compel, rather than conducting a summary trial." *Id.* "The district court, when considering a motion to compel arbitration which is opposed on the ground that no agreement to arbitrate has been made by the parties, should give to the opposing party the benefit of all reasonable doubts and inferences

9

that may arise." *Vernon v. Qwest Comm. Int'l, Inc.*, 857 F. Supp. 2d 1135, 1149 (D. Colo. 2012), *aff'd*, 925 F. Supp. 2d 1185 (D. Colo. 2013).

Whether an agreement to arbitrate exists "is simply a matter of contract between the parties." *Walker v. BuildDirect.com Techs., Inc.*, 733 F.3d 1001, 1004 (10th Cir. 2013). Accordingly, courts apply "ordinary state-law principles that govern the formation of contracts to determine whether a party has agreed to arbitrate a dispute." *Id.* The Parties agree that Colorado law applies here. [Doc. 45 at 9; Doc. 53 at 8]. "To be enforceable, a contract requires mutual assent to an exchange between competent parties for legal consideration." *French v. Centura Health Corp.*, 509 P.3d 443, 449 (Colo. 2022). "Under Colorado law, a contract requires a 'meeting of the minds.'" *Bellman*, 563 F. App'x at 613 (quoting *Schulz v. City of Longmont*, 465 F.3d 433, 438 n. 8 (10th Cir. 2006)). "This is true for both express contracts and contracts that are implied in fact based on the conduct of the parties." *Id.* "The requisite meeting of the minds is established by the parties' acts, conduct, and words, along with the attendant circumstances, and not by any subjective, unexpressed intent by either party." *French*, 509 P.3d at 449.

Defendant argues that "all parties mutually assented to the exchange and consideration" as to the Employment Agreement. [Doc. 45 at 10]. In support, Defendant cites to the following evidence: (1) a declaration from Ms. Moonan in which she states, *inter alia*, that "AGEISS and Mr. Richan negotiated and entered into an Executive Employment Agreement at the time he was offered and accepted the position of President of AGEISS" and "Mr. Richan acknowledged and agreed to the provisions of the Executive Employment Agreement, including the arbitration clause, electronically via e-mail on December 31, 2020," [Doc. 11-1 at ¶¶ 7, 11]; (2) the unsigned Employment Agreement, [*id.* at 12-17]; and (3) the "12/31/20 Emails," *see* [id. at 10-11].

The Court respectfully concludes that the evidence presented by Defendant is insufficient

to meet its burden of putting forth "evidence sufficient to demonstrate the existence of an enforceable arbitration agreement." *Bellman*, 563 F. App'x at 612. First, with respect to the December 31, 2020 emails and Ms. Moonan's assertion that these emails demonstrate Mr. Richan's assent to the Employment Agreement, the Court disagrees. The emails reflect that on December 31, 2020, Ms. Lawrence sent an email to Ms. Moonan, copying Mr. Richan (among others). [Doc. 11-1 at 10]. The email, bearing the subject line "adding signatures to executed documents," states: "Ted/Jeff[,] Please confirm via email response that you approve adding your electronic signature to <u>the attached documents</u>. Patty[,] Per your call with Ted, please add electronic signatures to <u>the attached 2 documents</u> after you receive email approval from Ted/Jeff." [*Id.* at 10-11 (emphases added)]. Mr. Richan replied, "[e]verything looks good. Patty – please sign for me as well." [*Id.* at 10].

Defendant does not indicate whether the specific "attached documents" affixed to Ms. Lawrence's email are included in the case record. *See generally* [Doc. 45]. Defendant concedes, however, that the Employment Agreement was *not included* in the documents attached to Ms. Lawrence's email. Specifically, Defendant admits that "the Loan Agreement contained a blank 'placeholder' page" for the Employment Agreement, but the Employment Agreement "was erroneously omitted from the packet [of documents] and Richan's signature was thus not affixed to it." [Doc. 54 at 4-5]. Indeed, Ms. Moonan further declares that

> Through email on December 31, 2020, I was asked by Ted Richan, Donna Lawrence, and Jeffrey Lawrence to electronically affix their signatures to a Loan Agreement, consisting of multiple loan documents or exhibits. . . . I did affix Mr. Richan's, Ms. Lawrence's, and Mr. Lawrence's signatures to the Loan Agreement as requested. One of the exhibits to the Loan Agreement was Mr. Richan's [Employment Agreement]. The Loan Agreement packed I received on December 31, 2020 contained a placeholder for the [Employment Agreement], <u>but the actual [Employment Agreement] was not included in the packet</u>. Therefore, I did not affix Mr. Richan's signature to it.

11

[Doc. 54-4 at ¶¶ 4-5 (emphasis added)]. Thus, at best, the evidence presented by Defendant demonstrates that Mr. Richan approved his signature on the documents attached to Ms. Lawrence's December 31 email—which Ms. Moonan declares, and Defendant concedes, did not include the Employment Agreement.[3] The fact that Mr. Richan agreed to sign *other documents* does not plainly demonstrate an agreement to sign the Employment Agreement, and the Court "must give to the opposing party the benefit of all reasonable doubts and inferences that may arise." *Vernon*, 857 F. Supp. 2d at 1149.

Furthermore, the declaration from Ms. Moonan asserting the legal conclusion that Mr. Richan assented to the Employment Agreement does not constitute evidence from which the Court could conclude that a valid arbitration agreement exists. *Cf. Skrzypczak v. Roman Cath. Diocese Of Tulsa*, 611 F.3d 1238, 1244 (10th Cir. 2010) (in summary judgment context, a court need not to accept legal conclusions made in a declaration); *Palacios v. Salt Lake City Police Dep't*, No. 2:20-cv-00714-DBB, 2022 WL 605005, at *8 (D. Utah Mar. 1, 2022) (a declaration which contains legal conclusions is unhelpful to summary judgment analysis). Finally, the unsigned Employment Agreement is insufficient to establish a valid arbitration agreement. Defendant asserts that arbitration agreements need not be signed to be enforceable. *See* [Doc. 45 at 13]. While this is true, "this does not relieve Defendant[] of [its] burden to establish the existence of an enforceable agreement in the first place." *Bellman*, 563 F. App'x at 614. "[W]hile a signature is not always required, the parties must still have entered into a valid arbitration agreement under state law." *Id.* The Court is respectfully not persuaded that Defendant has met its burden of establishing that the

---

[3] Defendant does not argue that—or submit any evidence establishing that—the "packet" referenced by Ms. Moonan is different from the "attached documents" on which Mr. Richan permitted his signature. It is Defendant's burden to present the Court with sufficient evidence to demonstrate the existence of assent, *Bellman*, 563 F. App'x at 612, and the Courdt does not draw inferences in favor of the moving party. *Vernon*, 857 F. Supp. 2d at 1149.

Parties did so here.

In the alternative, Defendant argues that the Employment Agreement "was part of a much broader Loan Agreement" and that "[t]here is no dispute that [Mr.] Richan authorized his signature on the Loan Agreement." [Doc. 54 at 5 (citing Doc. 53-1 at ¶ 6)]. But as explained above, Defendant has not submitted any evidence demonstrating that the Employment Agreement, specifically, was attached to the email to which Mr. Richan responded and approved his signature for. *See* [Doc. 45; Doc. 54; Doc. 11-1 at 10-11]. Nevertheless, the Court notes that the Loan Agreement appears to contain Mr. Richan's written signature, *see* [Doc. 54-1 at 23], and thus moves to Defendant's substantive arguments. Defendant maintains that by signing the Loan Agreement, Plaintiff necessarily assented to the Employment Agreement. [Doc. 54 at 5]. In support, Defendant asserts as follows: (1) the Loan Agreement "contain[s] ten interrelated documents identified as 'Exhibits,'" including "Employment Agreements," [*id.* (citing Doc. 54-1 at 1)]; (2) Mr. Richan's Employment Agreement "is referenced at least twelve times in the Loan Agreement and its exhibits," [*id.* at 6]; and (3) "[b]y its terms, the [Employment Agreement] and all Loan Documents are integrated into the Loan Agreement." [*Id.*].[4]

The Court is respectfully unpersuaded by these arguments. Here, while the Loan Agreement lists "Employment Agreements" as an exhibit, *see* [Doc. 54-1 at 2], the Court notes

---

[4] AGEISS's remaining arguments suggest that if the Court does not conclude that Mr. Richan executed the Employment Agreement, this means that Mr. Richan breached the Loan Agreement. *See, e.g.*, [Doc. 54 at 6 ("In the Loan Agreement, Richan represented and warranted that he executed and delivered any instrument to which he was a party under the Loan Agreement, including the Loan Documents (which included the [Employment Agreement].") (emphasis omitted); *id.* ("Under the Loan Agreement, it is an 'Event of Default' if . . . Richan contests any Loan Document.") (emphasis omitted); *id.* at 7 ("[F]or the entire Loan Agreement to be valid, Richan's [Employment Agreement] must be valid and enforceable.")]. Whether Mr. Richan has complied with all the terms of any agreement with AGEISS is not before the Court. Instead, the Court's inquiry is limited to whether Defendant, as the moving party, has put forth evidence demonstrating the existence of a valid arbitration agreement.

that there is no actual employment agreement for Mr. Richan—either the Employment Agreement or any other iteration of an employment agreement—attached to the Loan Agreement filed on the docket. *See generally* [*id.*]. Indeed, Exhibit D does not actually contain any employment agreements; rather, it states "Exhibit D[,] Employment Agreements[,] [AS APPROVED BY THE BOARD OF AGEISS INC.]" [*Id.* at 52]. The mere fact that the Loan Agreement references "Employment Agreements," without more, does not demonstrate that Mr. Richan assented to the specific term of the Employment Agreement requiring AAA arbitration or had knowledge of those terms when purportedly executing the Loan Agreement. Similarly, the bare fact that the Loan Agreement references employment agreements does not demonstrate that Mr. Richan agreed to the arbitration clause in the Employment Agreement, given the fact that the specific Employment Agreement at issue in this case is not attached to nor specifically referenced in the Loan Agreement. *See* [Doc. 54 at 6]; *see also, e.g.*, [Doc. 54-1 at 11]; *see also Vernon*, 857 F. Supp. 2d at 1150.

Finally, Defendant asserts that the Employment Agreement is "integrated into the Loan Agreement," citing to the following contractual provision:

> This Agreement, the Note, the Security Instruments and any other Loan Document executed in connection herewith integrate all the terms and conditions mentioned herein or incidental hereto and supersede all oral representations and negotiations and supersede, amend and restate prior writings with respect to the subject matter hereof.

[Doc. 54-1 at 22; Doc. 54 at 7]. Presumably, Defendant's argument is based on the Loan Agreement's definition of "Loan Documents," that is, "[the Loan] Agreement, its attachments and exhibits, the Bank Loan instruments, and all other instruments, agreements, and documents entered into from time to time, evidencing or securing the Loan or any obligation of payment thereof or performance of Borrower's Obligations in connection with the transaction contemplated

14

hereunder, each as amended." [Doc. 54-1 at 4]. But again, this provision does not demonstrate that by signing the Loan Agreement, Mr. Richan assented to the arbitration provision in the Employment Agreement. Again, the Employment Agreement is not plainly attached as an exhibit to the Loan Agreement, [*id.* at 52], and in any event, there is no evidence that the Employment Agreement was ever "executed in connection" with the Loan Agreement. Under Colorado law, "[w]here a party seeks to enforce terms or conditions incorporated by reference in a contract, 'it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms.'" *Vernon*, 857 F. Supp. 2d at 1150 (quoting *Taubman Cherry Creek Shopping Ctr., LLC v. Neiman-Marcus Grp., Inc.*, 251 P.3d 1091, 1095 (Colo. App. 2010)).

Finally, AGEISS argues that even if Mr. Richan did not electronically agree to the terms of the Employment Agreement, "courts have unwaveringly held that continued job performance is a valid method of accepting an agreement to arbitrate in lieu of a signature." [Doc. 45 at 13]. Defendant cites a number of cases in support of this assertion. [*Id.* at 13-14]. In response, Mr. Richan argues that the cases relied upon by Defendant are distinguishable from the instant matter, and asserts that there is "no evidence that [he] was informed that his continued employment would constitute acceptance of the terms of the unexecuted [Employment Agreement] and the arbitration provision contained therein." [Doc. 53 at 13]. Moreover, Mr. Richan points to his declaration, wherein he states that he did not understand that his continued employment to constitute acceptance of the Employment Agreement's terms. [*Id.* (citing Doc. 53-1 at ¶ 7)].

Generally speaking, "[a]cceptance may be shown 'by act or conduct.'" *Terlizzi v. Altitude Mktg., Inc.*, No. 16-cv-01712-WJM-STV, 2018 WL 2196090, at *7 (D. Colo. May 14, 2018) (quoting *Linder v. Midland Oil Ref. Co.*, 40 P.2d 253, 254 (Colo. 1935)). "Conduct, in particular, manifests assent if the party in question 'intends to engage in the conduct <u>and knows or has reason</u>

15

to know that the other party may infer from his conduct that he assents.'" *Id.* (emphasis added) (quoting Restatement (Second) of Contracts § 19(2) (1981)); *see also Haberl v. Bigelow*, 855 P.2d 1368, 1374 (Colo. 1993) (favorably citing and discussing section 19 of the Restatement (Second) of Contracts). When an agreement "is manifested by conduct, it is said to be a contract implied-in-fact." *Fair v. Red Lion Inn*, 920 P.2d 820, 825 (Colo. App. 1995), *aff'd*, 943 P.2d 431 (Colo. 1997). "Implied-in-fact contracts arise from conduct of the parties which evidences a mutual intention to contract with each other." *Id.* (emphasis added). Moreover, "[a]n offer can be accepted by the rendering of a performance only if the offer invites such an acceptance." Restatement (Second) of Contracts § 53.

Here, Defendant has not provided any evidence—such as a contractual provision or an email communication—demonstrating that Mr. Richan knew or had reason to know that through his continued employment, AGEISS would infer his assent to the terms of the Employment Agreement as written, and in particular, the arbitration clause. *Compare Hardin v. First Cash Fin. Servs., Inc.*, 465 F.3d 470, 477 (10th Cir. 2006) (applying Oklahoma law and concluding that where the employment agreement "stated that [the employee's] continued employment . . . would manifest her assent," employee assented to agreement by continuing employment); Restatement (Second) of Contracts §§ 19, 53. For this same reason, there is no evidence before the Court that the Parties shared a mutual intention to enter into the Employment Agreement.

The Court further notes that the cases cited by Defendant in support of its argument are distinguishable from or inapplicable to this case. For example, some of the cases discuss whether continued employment is sufficient *consideration* to support a binding contract, providing little to no analysis as to whether continued employment may constitute acceptance of an offer. *See Lucht's Concrete Pumping, Inc. v. Horner*, 255 P.3d 1058, 1062-63 (Colo. 2011); *Grady v.*

16

*DIRECTV Customer Servs. Inc.*, No. 14-cv-03474-CMA-NYW, 2015 WL 3619337, at *4 (D. Colo. June 10, 2015); *Levine v. Vitamin Cottage Nat. Food Markets, Inc.*, No. 20-cv-00261-STV, 2021 WL 4439800, at *10-12 (D. Colo. Sept. 27, 2021). Moreover, unlike the instant matter, these cited cases included either an agreement signed by the employee or an express statement informing the employee that his or her continued employment was conditioned on the employee's assent to the employment agreement. *Lucht's*, 255 P.3d at 1060; *Levine*, 2021 WL 4439800, at *2, *8; *Grady*, 2015 WL 3619337, at *4. And finally, the Court does not find *Churchey v. Adolph Coors Co.*, 759 P.2d 1336 (Colo. 1988), particularly helpful to Defendant's position. In *Churchey*, the Colorado Supreme Court summarized an earlier case—*Continental Air Lines, Inc. v. Keenan*, 731 P.2d 708 (Colo. 1987)—and stated that, under an "approach recognized in *Keenan*," continued employment could constitute acceptance of an offer if it was shown that "the employer's promulgation of [new employment terms] was an offer and that the employee's initial or continued employment constituted acceptance of that offer." *Churchey*, 759 P.2d at 1348 (citing *Keenan*, 731 P.2d at 711 & n.1). While *Churchey* supports the proposition that continued employment *can* be construed as acceptance of new terms of employment, *Churchey* does not obviate Defendant's obligation to demonstrate that the continued employment "constituted acceptance of [the] offer"— i.e., that Mr. Richan knew or had reason to know that his continued employment would constitute assent. *Terlizzi*, 2018 WL 2196090, at *7.[5]

For these reasons, the Court finds that Defendant has not met its burden of setting forth "evidence sufficient to demonstrate the existence of an enforceable agreement." *Bellman*, 563 F.

---

[5] The other cases cited by Defendant are out-of-Circuit cases that do not apply Colorado law. *See Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359 (11th Cir. 2005); *Dantz v. Am. Apple Grp., LLC*, 123 F. App'x 702 (6th Cir. 2005); *Hightower v. GMRI, Inc.*, 272 F.3d 239, 241 (4th Cir. 2001).

App'x at 612.  Accordingly, the burden does not shift to Plaintiff to establish a genuine dispute of material fact regarding the existence of an agreement.[6]  *Id.*  The Motion to Compel is thus respectfully **DENIED**, and the stay in this case is **LIFTED**.

## CONCLUSION

Therefore, **IT IS ORDERED** that:

(1) Defendant's Motion to Compel Arbitration [Doc. 45] is **DENIED**;

(2) The stay in this matter is **LIFTED**; and

(3) Within three (3) days of this Order, the Parties are **DIRECTED to CONTACT** the Chambers of Magistrate Judge Michael E. Hegarty to set a Scheduling Conference in this matter.

DATED:  August 29, 2022

BY THE COURT:

Nina Y. Wang
United States District Judge

---

[6] Indeed, even if it were to determine that Defendant had carried its burden in the first instance, the record before the Court at this time would lead it to conclude that Plaintiff has come forward with sufficient evidence to create a genuine issue of material fact that would preclude the Court from granting this instant Motion.